THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN F. AHEARN, Appellant.

New York (city of) — removal of borough president by governor on charges — constitutionality of charter provisions relating thereto — construction thereof — invalid reappointment of removed officer by board of aldermen.

The statutes providing for the removal of a borough president by the governor on charges, after an opportunity to be heard in his own defense, do not conflict with the home rule provisions of the Constitution or violate either the letter or spirit of those provisions which guarantee the principles of local self-government, and are constitutional and valid.

The obligation rests on the courts both to assume that legislation was not intended to beget absurdities, and to exhaust the limit of legitimate construction before affixing to it any such consequences. The principles ordinarily governing the interpretation of statutes command the courts to favor a construction which is most agreeable to reason and justice, to consider the entire statute and to give effect to every clause and part thereof, thus securing a consistent and harmonious whole, and to avoid a construction which would leave any provision of the statute without effect, or which would result in a virtual repeal by implication of one provision by another.

It is not only reasonable, but legally justifiable, to believe that in enacting the provision relative to filling a vacancy in the office of borough president, from which an incumbent had been removed for cause, the legislature had clearly in mind the earlier one relative to removal, and that in giving the power of appointment it intended to authorize the appointment of proper persons, and did not intend to include the power to select a person just found to be otherwise and, therefore, removed.

While statutes of the character designated are to be construed with strictness in favor of a defendant, still they are subject to rules of construction which are reasonable under the surrounding circumstances, and

they are not wholly exempt from the application of the principle that the means may be fashioned somewhat to the end, and that the letter is to be read somewhat in the light of the purpose to be accomplished.

Keeping in mind the purpose of the statute, the provision for removal should be construed as meaning a permanent and lasting ouster for the remainder of the term of the incumbent from the office which he has been filling, and whose obligations he has been found unable or unwilling to discharge. It should not be construed as contemplating a removal which might be turned into a merely temporary suspension by the immediate appointment to the vacancy caused by the removal of the very person who had just been removed. (Per HISCOCK, J.)

The provision of the Constitution relative to removal should be reasonably construed in view of the object sought to be accomplished. The manifest purpose was to provide a summary way for removing from office for the remainder of his term an unworthy official, and the governor was selected as the representative of the people to exercise this important power after the defendant had been afforded a reasonable opportunity to be heard in his defense. This power to remove was undoubtedly limited in its exercise to the balance of the term to prevent any interference with the right of the borough electors to elect a successor after the expiration thereof. (Per E. T. BARTLETT, J.)

The statute should receive that liberal construction which will effectuate the purpose to be fairly attributable to the legislative enactment. The power to remove from the office, as the result of proceedings under the statute, coupled with the power conferred to fill the vacancy caused by the removal, negatives the person's right to be reinstated in the office during the term for which he had been elected. (Per GRAY, J.)

*People* v. *Ahearn,* 131 App. Div. 30, affirmed.

(Argued June 18, 1909; decided October 29, 1909.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered March 13, 1909, which reversed a judgment of Special Term sustaining a demurrer to the complaint and overruled such demurrer.

The action is one of quo warranto and the question certified to us is, " Does the complaint herein state facts sufficient to constitute a cause of action."

The complaint, amongst other things, alleges that in 1905 the defendant was elected president of the borough of Manhattan for the term of four years beginning January 1, 1906, and at the appointed time duly qualified and entered upon

the discharge of the duties of said office; that in July, 1907, charges were duly made against him and filed with the governor of the state, which in effect accused him of incompetency in and maladministration of his office, copies of these charges being served upon the defendant and he being duly notified to appear and defend himself against the same, which he did; that the hearing continued from time to time through several weeks until on December 9, 1907, the governor made an order that, it appearing to his satisfaction that the charges were true and that the public interest required it, the defendant be removed from his office; that on December 19, 1907, the board of aldermen of the city of New York representing the borough of Manhattan appointed the defendant to fill the vacancy caused by his removal for the unexpired term, and this action was brought to oust the defendant from said office on the ground that such appointment was invalid.

*Martin W. Littleton* and *Frederick Allis* for appellant. The principle of home rule that underlies our political institutions applies as well to appointment as to election of local officers. (*People* v. *Albertson*, 55 N. Y. 56; *People* v. *Draper*, 15 N. Y. 561; *Rathbone* v. *Wirth*, 150 N. Y. 467; *People* v. *Mosher*, 163 N. Y. 41; *People* v. *Tax*, 174 N. Y. 431; Dillon on Mun. Corp. § 9; *People* v. *Morton*, 156 N. Y. 144; *People* v. *Hurlburt*, 24 Mich. 44.) The pivot on which this case turns is the question of eligibility; if defendant was a qualified candidate when he was elected by the aldermen on December 19, 1907, he has good title to his office; otherwise not. (*People* v. *Draper*, 15 N. Y. 532; *People* v. *Albertson*, 55 N. Y. 56; *Rathbone* v. *Wirth*, 150 N. Y. 466; *People* v. *Tax*, 174 N. Y. 431; *People* v. *Potter*, 47 N. Y. 380; *Barker* v. *People*, 3 Cow. 703; *People ex rel. Devery* v. *Coler*, 173 N. Y. 115; *Speed* v. *City of Detroit*, 98 Mich. 364.) Defendant was an eligible candidate at the time of said aldermanic election to the office he now holds unless he was disqualified by the governor's act of removal on December 9,

1907. (*People* v. *Board,* 129 N. Y. 369 ; *Minor* v. *Happerset,* 21 Wall. 162 ; High on Ex. Leg. § 643 ; 23 Am. & Eng. Ency. of Law, 628, n. 2 ; *People* v. *Ryder,* 12 N. Y. 436 ; *People* v. *Perley,* 80 N. Y. 625.) Removal by the governor did not have the effect of disqualifying defendant and, therefore, he was a perfectly eligible candidate, and the aldermanic election conferred upon him a perfect title to his office. (*People* v. *Albertson,* 55 N. Y. 56 ; *People* v. *Draper,* 15 N. Y. 561 ; *Rathbone* v. *Wirth,* 150 N. Y. 467 ; *People* v. *Mosher,* 163 N. Y. 41 ; *People* v. *Tax,* 174 N. Y. 431 ; Dillon on Mun. Corp. § 9 ; *Matter of Guden,* 171 N. Y. 529 ; *People* v. *Hurlburt,* 24 Mich. 103 ; *Barker* v. *People,* 3 Cow. 686 ; *People ex rel. Devery* v. *Coler,* 173 N. Y. 118 ; *Rex* v. *Richardson,* 1 Burr. 538 ; *People* v. *Dorthy,* 20 App. Div. 318.)

*Edward R. O'Malley,* Attorney-General (*Ezra P. Prentice* of counsel), for respondent. Public office involves the ideas of tenure and duration as well as rights, powers, duties and emoluments. The defendant was removed from the office of borough president for the remainder of the term for which he had been elected. (*People* v. *Nostrand,* 46 N. Y. 375 ; *Matter of Oaths,* 20 Johns. 492 ; *Matter of Hathaway,* 71 N. Y. 238 ; *U. S.* v. *Hartwell,* 6 Wall. 385 ; *People* v. *Duane,* 121 N. Y. 367 ; Mechem on Public Officers, § 1 ; *Thurston* v. *Clark,* 107 Cal. 285 ; *U. S.* v. *Germaine,* 99 U. S. 508 ; *Hall* v. *Wisconsin,* 103 U. S. 5 ; *Aufmordt* v. *Hadden,* 137 U. S. 310 ; *Wardlaw* v. *Mayor,* etc., 29 J. & S. 174 ; *Olmstead* v. *Mayor, etc.,* 10 J. & S. 481.) The purpose of the removal section of the charter was to remedy the public evil of the continuance in office of an unworthy official. The court should construe the charter so as to effectuate the legislative purpose and obviate the evil which was the occasion of the enactment of the removal section. The charter must, therefore, be so construed as to hold the attempted appointment of the defendant to fill the unexpired term from which he had been removed illegal, null and void. (*Sturgis* v. *Spofford,* 45 N. Y. 446 ; *People ex rel.*

*Mitchell* v. *Sturges,* 27 App. Div. 387; Cons. Laws, ch. 47, § 38; *People ex rel. Wood* v. *Lacombe,* 99 N. Y. 43; *Mead* v. *Stratton,* 87 N. Y. 493; *Matter of O'Neil,* 91 N. Y. 516; *Tonnelle* v. *Hall,* 4 N. Y. 140; *Delafield* v. *Brady,* 108 N. Y. 524; *Dibble* v. *Hathaway,* 11 Hun, 571; *People ex rel. T. T. St. R. R. Co.* v. *Comrs. of Taxes,* 95 N. Y. 554; *Burch* v. *Newbury,* 10 N. Y. 374; *Oswego Starch Factory* v. *Dolloway,* 21 N. Y. 449.) If the charter is construed to confer upon the members of the board of aldermen the power to appoint the defendant to fill out the unexpired portion of the term from which he has been removed by the governor, the constitutional and legislative policy of this state, which confers upon localities the power of appointment or election of local officers, but preserves accountability to the state by conferring upon the governor the power to remove, will be nullified. (Const. of N. Y. art. 10, §§ 2, 7.)

*Nelson S. Spencer* for committee of citizens.

HISCOCK, J. Section 382 of the charter of New York (Chapter 466 of the Laws of 1901) by its own terms and by reference to other constitutional and statutory provisions relating to removal of county officers, provided for the removal of the defendant by the governor on charges after an opportunity to be heard in his defense, and no claim is made that all provisions for the trial and protection of the defendant were not observed in the proceeding which resulted in his removal. It is, however, somewhat argued that the provisions purporting to confer upon the governor the power of removal of defendant conflict with what are commonly known as the Home Rule provisions of the Constitution, and are, therefore, invalid. We are so agreed that this argument is not well founded, that the provisions under which the governor proceeded are constitutional and valid, and that they do not violate either the letter or the spirit of those provisions which secure and guarantee the principles of local self-government, that it does not seem necessary to discuss them.

Assuming, therefore, that the removal of the defendant was

entirely valid, I shall proceed to a discussion of the other questions presented for our consideration and which relate to the validity of his subsequent appointment.

This appointment, purported to be made by virtue of a provision in the same section of the charter already referred to and which reads : " Any vacancy in the office of president caused by removal from the borough, or otherwise, shall be filled for the unexpired term by an election to such vacancy made by a majority vote of all the members of the board of aldermen then in office representing said borough." Whether that is material or not, it is conceded that the word "election" in this provision is equivalent to the word "appointment." The People insist in support of this action that the removal of the defendant deprived him of his office for its entire term and that he could not be appointed to the vacancy for the unexpired term under the provisions just quoted. The appellant, on the other hand, insists that such was not the case and that by such removal neither the board of aldermen was barred from appointing him nor he disqualified from accepting such appointment.

It occurs to the mind at once that if the appellant's theory is correct and the board of aldermen was authorized to appoint him to the vacancy just caused by his removal, the legislature has solemnly enacted a statute authorizing conspicuously inconsistent acts and absurd results. It has authorized the governor to try and remove a public official as unworthy to hold office and the board of aldermen to select him forthwith as a proper person to fill the resulting vacancy. It has provided that the action of one branch of the government forthwith may be nullified by that of another ; that a public official who has been punished for inefficiency and maladministration of his office may be reimbursed for his loss by appointment to the very office of which he has been deprived and that the public service, supposed to be safeguarded and benefited by his removal, may be demoralized by his immediate reinstatement. In effect it has repealed the provision in the charter providing for removal of officials for

cause by another provision in the self-same section authorizing the reappointment of the man who had just been dismissed.

Such results would so offend against the principles of an orderly and efficient administration of government as well as those of ordinary common sense that no one would be likely to defend them as a product of wise legislation. But it was urged by the learned counsel for the appellant on the argument that neither his client nor the courts are responsible for ill-considered legislation and that unwise legislative enactments do not justify unauthorized judicial amendments. If the legislature has actually ordained that such results as these should be permitted, their action is final. But the principle is equally true that the obligation rests on the courts to assume that legislation was not intended to beget absurdities and to exhaust the limit of legitimate construction before affixing to it any such consequences. The principles ordinarily governing the interpretation of statutes command us to favor a construction which is most agreeable to reason and justice, to consider the entire statute and to give effect to every clause and part thereof, thus securing a consistent and harmonious whole, and to avoid a construction which would leave any provision of the statute without effect, or which would result in a virtual repeal by implication of one provision by another. It is, however, urged that such familiar rules are not here applicable; that if the statute is so construed as to prohibit the appointment of appellant, it must be because there is read into it by implication a disqualification after removal to hold office, and that such disqualification is in the nature of a fine, forfeiture or penalty and not to be readily implied. This consideration does not appear to be necessarily involved.

The decision of this case, it would seem, may be rested on the construction of the clause giving power to the board of aldermen to fill the vacancy caused by appellant's removal, rather than on any implication in the one authorizing removal, and if this is so, there will not be involved primarily and properly any question of appellant's disqualification for or forfeiture of the right of appointment to the vacancy. The question will

simply be one of the extent of and limitations upon the power of appointment which the legislature intended to confer, and will be subject to the ordinary rules of statutory construction. Those rules, as has been pointed out, require us to consider the entire scope and purpose of the statute, and to consider one provision in connection with the others. When we do this, we are not justified in believing that the legislature in providing for filling a vacancy overlooked or disregarded the proceedings just authorized which might lead to such vacancy, or that it intended to permit that to be undone under one clause which had just been accomplished under another one, or that it intended to clothe an appointing board with the power to fill an office with an appointee who had just been ousted therefrom because adjudged to be an improper person to hold it. On the contrary, it is not only reasonable, but legally justifiable to believe that in enacting the later provision the legislature had clearly in mind the earlier one, and that in giving the power of appointment it intended to authorize the appointment of proper persons and did not intend to include the power to select a person just found to be otherwise. This exception or limitation is to be understood.

If the proprietor of a business organization should direct one foreman to investigate the conduct of a workman and discharge him if found dishonest or incompetent, and should at the same time authorize another foreman to hire some one to fill the vacancy thus arising, I suppose this latter authority would always and reasonably be construed as permitting the employment of some new competent man and never as meaning the immediate reinstatement of one just dismissed for cause.

But if we consider this case from the standpoint chosen by appellant and assume that its decision is dependent on the construction of the removal clause and that in order to succeed the People must maintain the proposition that appellant's removal deprived him of his office for its entire term and, therefore, of the right to be appointed to the vacancy although such result was not specifically expressed, I see no reason to shrink from this test or to be doubtful of the end to which it will lead.

Doubtless we might say, as is so earnestly urged by counsel, that the strict letter of the statute would be satisfied by a removal which ousted appellant from his office for a day or an hour until some appointing power could reinstate him. But if we consider the general scope and purpose of this statute we shall be led to the conclusion that the legislature must have contemplated and intended more than this and that the language which it employed is susceptible of a construction which will carry out its purpose. The removal which is authorized in such a case as this can only be made after the incumbent has been heard in his own defense upon charges which challenge his official conduct and qualifications for office and has been found guilty. The punishment of removal from office is inflicted because he has been found to have committed acts indicating an unfitness to hold it. We have what is equivalent to a finding that sufficient cause exists why the incumbent should not be allowed to continue in his office and a judgment that, therefore, he be deprived of it. It is true that the proceeding in which this occurs is an executive rather than a judicial one. Still it is subject to certain fundamental rules of law, and the conceded facts in this case illustrate how analogous it may be in its essential features to a trial before a judicial tribunal.

It is of course plain that the legislature intended that the proceeding should be a serious one and an effective method of getting rid of unfit public officials. It is equally clear and will doubtless be so conceded in anything which may be said or written on the other side of this question, that this purpose will be frustrated and the administration of the law turned into a farce if under it an official may be immediately reappointed and a removal turned into a mere temporary suspension. In order to avoid such a result and keeping in mind the purpose of the statute we are justified, in my judgment, in construing the removal for which it provides as meaning a permanent and lasting ouster for the entire remaining term of the incumbent from the office which he has been filling and whose obligations he has been found unable or unwilling to discharge. As

was well said by Mr. Justice SCOTT at the Appellate Division, an office implies " much more than the right to physically occupy a specified room, to exercise certain power and to receive a prescribed emolument." So far as its beneficial aspect was concerned, appellant's office consisted of the right to enjoy certain powers, privileges, honors and emoluments for a given term, and when the statute prescribed that he should be removed it may be construed to mean that he should be removed from and deprived of all that which thus made up his office, namely, the right to enjoy these things for and during the entire term for which he had originally been selected. It is of course true, as is argued by counsel, that we do not speak of removing an official from his " term " of office. But the right to enjoy for a certain period the privileges and profits of a given position is an important element of an office in its complete conception, and a removal from the office under the conditions here present may fairly mean a dismissal for that period from those rights and privileges.

If it should be assumed, as argued by appellant, that this construction, because it will debar him from appointment to the vacancy for the unexpired balance of his term, amounts to reading into the statute a disqualification for appointment which is not expressly written there, and, therefore, must be subjected to the rules of construction applicable to quasi penal statutes, this test will be survived.

While statutes of the character designated are to be construed with strictness in favor of a defendant, still they are subject to rules of construction which are reasonable under the surrounding circumstances, and they are not wholly exempt from the application of the principle that the means may be fashioned somewhat to the end and that the letter is to be read somewhat in the light of the purpose to be accomplished.

In *Bolles* v. *Outing Company* (175 U. S. 265) it was said : " The statute, then, being penal, must be construed with such strictness as to carefully safeguard the rights of the defendant and at the same time preserve the obvious intention of the legislature. If the language be plain, it will be construed

as it reads, and the words of the statute given their full meaning; if ambiguous, the court will lean more strongly in favor of the defendant than it would if the statute were remedial. In both cases it will endeavor to effect substantial justice."

In *U. S.* v. *Lacher* (134 U. S. 624) in construing a criminal statute the court said : " But though penal laws are to be construed strictly, yet the intention of the legislature must govern in the construction of penal as well as other statutes, and they are not to be construed so strictly as to defeat the obvious intention of the legislature. * * * 'It appears to me,' said Mr. Justice STORY, in *United States* v. *Winn*, 3 Sumner, 209, 211, ' that the proper course, in all these cases, is to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature.' "

It is said by Mr. Sedgwick in his work on Statutory and Constitutional Law (2nd ed. 282) : " The rule that statutes of this class are to be construed strictly, is far from being a rigid or unbending one; or rather, it has in modern times been so modified and explained away, as to mean little more than that penal provisions, like all others, are to be fairly construed according to the legislative intent as expressed in the enactment; the courts refusing on the one hand to extend the punishment to cases which are not clearly embraced in them, and on the other, equally refusing by any mere verbal nicety, forced construction, or equitable interpretation, to exonerate parties plainly within their scope."

The forfeiture of rights otherwise existing will sometimes be inferred from penal statutes which do not expressly prescribe such results. Thus in *Griffith* v. *Wells* (3 Denio, 226) it was held that where a statute imposes a penalty for doing an act, such act is unlawful, although not in terms prohibited or declared to be illegal, and a right of action to recover for liquors was denied because the plaintiff had sold them in violation of a statute which only inflicted a penalty upon one selling liquors without a license, and did not in terms prohibit

said sale. It was held to be a fair inference that when a stat-
ute imposed a penalty for the performance of a certain act it
intended to make such act illegal.

Some aid in the consideration of this subject may be
derived from an examination of the general statute relating
to vacancies in public offices.

Section 20 of the Public Officers Law (L. 1892, ch. 681, as
amended) in force when appellant was removed, provides :
" Every office shall be vacant upon the happening of either
of the following events before the expiration of the term
thereof: * * * 3. His (the incumbent's) removal from
office. * * * 5. His conviction of a felony, or a crime
involving a violation of his oath of office."

Thus the conviction of certain crimes and a removal from
office have precisely the same effect on an official's incumbency
of office. Either event ousts him and makes the office vacant.
There is no express provision in either case that his ouster shal.
be for the entire term and that he may not be immediately
appointed to fill the vacancy caused thereby. If he can be
appointed to fill the vacancy in one case, he may be in the other.

Section 117 of the Penal Code provides that the willful
omission by a public officer to perform any duty of his office
shall be a misdemeanor and, therefore, a conviction of such
an offense would be a " conviction of * * * a crime
involving a violation of his oath of office," and cause a
vacancy. A misdemeanor is not punishable by imprison-
ment in state's prison and, therefore, within section 707 of·
the Penal Code, such conviction would not forfeit " all pub-
lic offices, and suspends, during the term of the sentence, all
the civil rights, and all private trusts " of the person sen-
tenced. In other words, so far as these provisions are con-
cerned, a person convicted of a misdemeanor would not suffer
a general disqualification to hold public office, and his right
to be appointed to the vacancy caused by his conviction would
depend upon the construction of the statute declaring the
vacancy. Is it possible that when the statute provides that
conviction of a crime involving violation of oath of office

shall be regarded as so seriously impairing an incumbent's competency and usefulness that *ipso facto* it shall oust him from office, it still intends that this effect and ouster may be temporary and that the individual may immediately be appointed and restored to the very vacancy which has been so promptly and imperatively created even though he may still be subject to imprisonment on the conviction which has operated to disqualify and oust him ? It is not a sufficient answer to this possibility to say that it would never occur and that no appointing power would ever have the temerity to make such an appointment. The test of the meaning and purpose of a statute is what may be rather than what probably will be done under it. And as has been suggested under the statute there is and ought to be no distinction between such a criminal conviction and a removal for cause by the governor in depriving an incumbent of his office and creating a vacancy. If one may be turned into a mere temporary suspension the other may.

Brief attention next must be given to some arguments in behalf of appellant based on facts and reasons which are believed to be at least indirectly opposed to the foregoing views.

Our attention is called to various cases in which the legislature has affixed as a consequence to conviction for certain crimes a disqualification to hold office, and to the provisions regulating the nature of the judgment on impeachment of a public officer and which provide that the defendant either may be simply removed from office or may be removed from office and disqualified to hold and enjoy a particular office or class of offices or any office of profit, trust or honor, and because of these provisions of or for express disqualification it is argued that no disqualification can have been intended in the absence of express provision and that certainly a more serious consequence should not be attached to the proceedings under review than to those of impeachment where disqualification must be expressly provided for. Independent of any other reply to this argument, the complete answer is

that the disqualification provided for in the instances cited is
a general disqualification either to hold any office or some
particular office, and nobody argues that such general dis-
qualification would flow from the removal of the defendant
in this case. The proposition here is that the defendant by
his removal has been deprived of a particular office for the
particular term for which he had been selected and within
which he was removed. If after an impeachment proceeding
where the judgment was simply of removal without general
disqualification the question should arise whether the official
might be immediately appointed to fill the vacancy caused by
his impeachment, a question somewhat analagous to the pres-
ent one would be presented. It is not overlooked that in the
impeachment trial of Judge Barnard, Judge Allen of the
Court of Appeals, sitting as a member of the impeachment
court, in urging that a judgment of mere removal would be
entirely inadequate, did seek to enforce the argument of
inadequacy by saying that under such judgment alone the
defendant might be appointed to fill the vacancy. That
statement, however, made as a matter of argument against a
certain form of procedure, is not to be regarded as a controlling
authority upon the question now before us.

It is true that it is urged that if defendant's removal is to
be construed as having the effect of barring him from appoint-
ment to the vacancy, it must be regarded as having effected a
general disqualification to hold any office. That argument
does not require serious attention. The defendant was tried
on charges affecting his administration of a certain office dur-
ing a certain term, and as a punishment he was removed from
that office. Because such removal barred him from immedi-
ate appointment to fill the vacancy for the unexpired term, it
ought not to be seriously claimed that it disqualified him to
take some other office or to be elected to a new term of the
same office, neither of which were in any way involved in his
trial and from neither of which he was removed.

But lastly it is said that if the vacancy caused by defend-
ant's removal were to be filled by an election by the people,

the latter would have the right to elect defendant notwithstanding his removal, and that no distinction can be drawn between the power of the people to fill the vacancy by election and that of the board of aldermen to fill it by appointment. While personally I am not prepared to assent to the proposition that if the power of filling the vacancy caused by appellant's removal had been conferred upon the voters of a limited district to be exercised by election, they would have had any greater power or discretion than the board of aldermen, it is sufficient to say for the present that that question is not here and it is not necessary to pass on it.

There is little chance that the principles actually involved in our decision will ever practically embarrass the right of selection by the people of whomsoever they desire, including the removed official. In nearly all of the cases which might arise, the power of temporarily filling the vacancy is conferred upon some appointing power and then the people elect for a full, complete term which could not be regarded as part of the unexpired term of office from which the official had been removed, but rather as a new term and for the election to which full term he would not be ineligible because of anything said here. Thus in the case of a removal of a sheriff as of other county officials the vacancy would be filled by temporary appointment and then an election would be held for a full entire term. While the election would be primarily occasioned by a vacancy arising from removal, the election could not be regarded as held for the purpose of filling a vacancy, but rather as held for the purpose of filling another term and, therefore, under the views hereinbefore set forth, while the official who had been removed would be prevented from taking the appointment to fill the vacancy in part of his original term, he would not be disqualified from accepting an election for what was treated as a new term. I fail to see any argument against this principle in the fact that the new term created by the Constitution might commence within the period covered by the original term from which an incumbent has been removed. That is a mere matter of constitutional or statutory provision.

The authorities upon this subject are not numerous. It is natural that they should not be. It would seldom happen that a person duly removed from office for cause after a hearing would attempt to ·intrude himself into the vacancy caused by his own conviction of wrongdoing in that office, or that an appointing power would permit occasion for legal controversy by appointing such person. The preponderance of whatever authority there is, is decidedly in favor of the conclusions which thus far have prevailed in this case.

The action of *State of Minnesota* v. *Dart* (57 Minn. 261) dealt with a case where a county treasurer had been removed from office for malfeasance. Pending his suspension under charges and his final removal he resigned and thereafter and before his removal he had been appointed by the board of county commissioners to the vacancy caused by his resignation. The court held that his eligibility for the office during the remainder of the term for which he had originally been elected was involved in the removal proceedings and that having been removed on charges he was rendered ineligible for appointment to the vacancy, and that he could not avoid this result by a voluntary resignation pending his trial.

In *State of Kansas ex rel. Coleman* v. *Rose* (74 Kan. 262) it was held that where a mayor had been removed from his office on conviction of official misconduct he could not be re-elected to fill the vacancy caused by such removal. It is true that in this case the judgment removing him expressly ousted him for the entire original term, but the court in making its decision affirmed the proposition that this provision for removal for the entire term was not essential to its decision ; that the removal under the circumstances without such special provision operated to deprive him of his office for the entire term during which he was removed.

The cases of *State of Iowa* v. *Welsh* (109 Iowa, 19) and *Matter of Advisory Opinion* (31 Fla. 1) are also cited as sustaining the People's position, and it is true that the opinion at least in the latter case does have that effect.

In the case of *State ex rel. Tyrrell* v. *Jersey City* (25

N. J. L. 536) the court had before it the consideration of a motion for a writ of peremptory mandamus directed to the common council of Jersey City commanding it to admit one Tyrrell as a member of said council. He had formerly been a member, had been expelled on charges of bribery and then had been re-elected. The court wrote to the effect that the sentence of expulsion did not disqualify him from being re-elected to the same office and also that having been re-elected he could not be expelled for the same offense. In *Matter of Guden* (71 App. Div. 423) it was said of this decision that it " is merely an authority to the effect that the common council of Jersey City had no power to expel a member for acts committed previous to his election, the question being whether such officer having been expelled from the council once, upon conviction of official corruption, and having been re-elected, could again be expelled for the same identical offense." Aside from this summary of what this case might be regarded as holding, it is subject to such considerations as may be applicable to an election by the people of an official who had been expelled from a legislative body as distinguished from an appointment.

I find nothing decided by the court and nothing written by Judge Cullen in *People ex rel. Devery* v. *Coler* (173 N. Y. 103, 112), urged upon our attention, which conflicts with the conclusions which have been reached. That case considered a statutory provision that the police commissioner of the city of New York " may, whenever in the judgment of the mayor of said city or the governor the public interests shall so require, be removed from office by either, and shall be ineligible for reappointment thereto." Judge Cullen was of the opinion that the provision rendering any incumbent who might be removed from the office of police commissioner ineligible for reappointment was unconstitutional, and this view was entertained because such disqualification was " of the most arbitrary character," since the incumbent might be removed without those charges or that hearing which are required in the present case, and for that reason a removal did not involve any reflection on the

official or personal character of the officer removed. There is no difficulty in seeing the substantial distinction between that case and this.

Passing beyond the decisions of courts, the attempt has been made to sustain the views urged in behalf of appellant by reference to the action of legislative bodies in passing on the cases of those who had been re-elected to fill vacancies caused by their expulsion and much importance has been given to the action of the English House of Commons in the *Wilkes* case. Wilkes was expelled for an offense of a political nature — a seditious libel — which does not appear to have been committed in any official capacity or to have involved personal turpitude or misfeasance in office, the House of Commons exercising a very broad power to expel for any cause which in its judgment unfits a member for parliamentary duties. (*Story on Const.* § 838.) It was at first determined by the House of Commons that this expulsion rendered Wilkes ineligible for election to fill the vacancy caused by his expulsion, but this action was subsequently rescinded. If necessary, it would seem that a substantial distinction might be drawn in resulting effects between a case of expulsion by a legislative body exercising very comprehensive jurisdiction over its own membership for political or other reasons not amounting to betrayal of official duties and where there may be no hearing and a case where the removal is based solely on official misfeasance and only occurs after a hearing. But it is unnecessary to consider this here for the legislative doctrine and practice adopted by the House of Commons in the *Wilkes* case if considered applicable to a case of expulsion for official misfeasance has been fairly rejected by our national House of Representatives upon facts which make the latter's action a basis of very pertinent argument here.

In 1870 expulsion proceedings were instituted against one Whittemore for alleged sale of appointments to the naval and military academies. Pending such proceedings the accused resigned from his office, and he was then at a special election chosen to fill the vacancy caused by such resignation. When

the credentials of such election were laid before the house a resolution was duly adopted, "That the House of Representatives decline to allow said Whittemore to be sworn as a Representative　＊　＊　＊　and direct that his credentials be returned to him." Accompanying this resolution was a preamble reciting the facts of the proceedings of expulsion against Whittemore and the fact that he had escaped expulsion by resigning. It was thus determined, *first*, that a member might not escape the effect of expulsion proceedings by resigning, and, *second*, that a member thus proceeded against for official misfeasance was not eligible for election to fill the vacancy caused by his resignation to escape expulsion. On the other side of the case attention will be called to the remarks of General Logan in supporting this action and resolution as breaking its force in this connection. He said that "he did not presume that the Constitution contemplated expulsion for any mere political reasons, or for anything except a violation of the rules of the House or an infraction of some existing law. He assumed that where the House had the right to expel for violation of its rules or of some existing law it had the same power to exclude a person from its body.　＊　＊　＊　It was right to exclude a man from·the House for crime. It was this feature of. crime which distinguished this case from those of Messrs. Giddings, of Ohio, and Brooks and Keitt, of South Carolina, who after·receiving the censure of the House, had resigned their seats, and after re-election had been admitted to the House. The case of Mr. Matteson, of New York, who had been censured, was also different, because he had returned to a Congress succeeding that in which he had been censured, and which had no jurisdiction of the offense committed against its predecessor."

There is nothing in these remarks which does or can alter the fundamental facts directly involved in the action of the House of Representatives. These were that Whittemore had been guilty of official misconduct ; that proceedings were instituted for his expulsion and which he escaped only by resigning ; that it was held that he could not escape the consequences of his

misconduct by so doing, and that his misconduct rendered him ineligible for election to the vacancy for the balance of the term caused by his resignation to escape such expulsion. Certainly it must follow that if the expulsion proceedings had proceeded to their termination and the member had been removed from office for his misconduct he would have been held to be ineligible to fill the vacancy.

It is especially significant, as destroying the authority of the Wilkes case as an authority in legislative practice in this country, that it was cited in debate as an authority against the action then being taken, and its doctrine rejected. (Hinds' Precedents of the House of Representatives, vol. 1, p. 487; vol. 2, p. 830, etc.) And in the debate full recognition was taken of the distinction between the Whittemore case and cases where members resigning after mere censure for causes political and not involving misfeasance had been re-elected, and also cases where the re-election had been to a Congress succeeding the one at which the member had been punished. In view of this action by one branch of our highest legislative body, statements and opinions which have been cited of various constitutional and historical writers based on the doctrine of the Wilkes case seem to lose their value as authorities in this country.

The order should be affirmed, with costs, and question certified answered in the affirmative.

EDWARD T. BARTLETT, J. I concur in the opinion of Judge HISCOCK.

This case on the conceded facts presents a single question of law, viz.: Can the defendant, John F. Ahearn, who was duly elected borough president of the borough of Manhattan by the electors of said borough for the term of four years, and duly removed from that office by the governor of the state, be reappointed by the board of aldermen of the city of New York, representing the borough of Manhattan, to fill the vacancy thereby created for the remainder of the unexpired term of about two years?

The power of the governor to make the removal and the regularity of the proceedings which resulted in the same are not challenged.

The proposition of the appellant briefly stated is, in substance, that, as there is no affirmative provision in the Constitution or statute forbidding the appointment of a removed official to serve for the remainder of his unexpired term, the defendant is now in lawful possession of the office from which the governor removed him, by virtue of the action of the board of aldermen of the city of New York appointing him to fill the vacancy caused by his removal.

A borough president is originally elected by the electors of the borough, while a vacancy is filled by a so-called "election" made by a majority vote of the board of aldermen representing the borough. (Charter, § 382.) The word "election" as used in this connection is the equivalent of appointment. (*Sturgis* v. *Spofford*, 45 N. Y. 446.) It is to be observed that the question of election by the people is not involved in this litigation.

If the proposition advanced on behalf of the defendant is sound, then the proceedings before the governor and the removal of the defendant from office were ill advised and a waste of time and money. There is, however, in my judgment, a complete answer to the defendant's position.

The charter of Greater New York (§ 382) provides that a borough president may be removed in the same manner as the mayor; by section 122 the mayor may be removed by the governor in the same manner as sheriffs. Article 10, section 1, of the Constitution deals with sheriffs, clerks of counties, district attorneys and registers. The closing sentence of this section reads as follows: "The governor may remove any officer in this section mentioned, within the term for which he shall have been elected; giving to such officer a copy of the charges against him, and an opportunity of being heard in his defense." The removal of this defendant by the governor, "within the term for which he was elected," involved, under the charter, the exercise of a power conferred upon him by

16

the Constitution. The extent of this power calls for a construction of the language of the Constitution already cited; a question of law with which the legislature has no concern. The governor was called upon to deal with this defendant, in the language of the Constitution, "within the term for which he shall have been elected." After the expiration of that term, the defendant, notwithstanding his removal, would have been free to go before the electors of the borough asking for their votes to make him once more their president.

The vital question is whether the distinguished lawyers who framed the Constitution were dealing with substance or shadow; whether they intended that an unworthy official should be removed for the balance of the term "for which he shall have been elected;" or did they contemplate that he might be reinstated in his position, immediately after the governor's adverse decision, by the board of aldermen, of which body he was a member at the time of his removal?

This provision of the Constitution should be reasonably construed in view of the object sought to be accomplished. The manifest purpose was to provide a summary way for removing from office for the remainder of his term an unworthy official, and the governor was selected as the representative of the people to exercise this important power after the defendant had been afforded a reasonable opportunity to be heard in his defense. This power to remove was undoubtedly limited in its exercise to the balance of the term to prevent any interference with the right of the borough electors to elect a successor after the expiration thereof.

The question now presented is whether the governor can duly remove the defendant from office on a certain day and the board of aldermen reinstate him the following morning. As was well suggested on the argument, if the defendant can be his own successor by appointment, his removal is plainly nugatory and meaningless. It needs no extended argument to establish that such a construction fails to give due force and effect not only to the definition of "public

office," but to the language of the Constitution which confines the governor, as already pointed out, to the balance of the term for which the accused was elected. The words last quoted are words of limitation ; the framers of the Constitution were careful not to interfere with the right of the people to elect their officers in certain cases.

The power of removal vested in the governor is a meaningless provision unless " public office " implies more than mere title, power and compensation. Mr. Burrill, in his Law Dictionary, under the head of " office," gives this definition : " The idea of an officer clearly embraces the idea of tenure, duration, fees or emoluments, rights and powers, as well as that of duty ; a public station or employment; an employment confirmed by appointment of government." This statement is cited with approval in *People ex rel. Henry* v. *Nostrand* (46 N. Y. 375, 381). In *Matter of Hathaway* (71 N. Y. 238, 244) Judge Allen said : " Public office, as used in the Constitution, has respect to a permanent trust, to be exercised in behalf of the government, or of all citizens who may need the intervention of a public functionary or officer, and in all matters within the range of the duties pertaining to the character of the trust. It means a right to exercise generally, and in all proper cases, the functions of a public trust or employment, and to receive the fees and emoluments belonging to it, *and to hold the place and perform the duty for the term and by the tenure prescribed by law.*" (Italics not in original.) Many other authorities might be cited to this effect. The office to which the defendant was elected by the electors of the borough of Manhattan was the right to exercise all the powers and receive the emoluments of president of that borough for the term of four years.

I vote for affirmance.

Gray, J. The question may be considered close and debatable; but I am of the opinion that the statute should receive that liberal construction, which will effectuate the purpose to be fairly attributed to the legislative enactment.

The purpose was to remove, that is, to displace, for the term of his office, the official, who has been found guilty of acts, which rendered his continuance in office prejudicial to the public interests and welfare. When section 382 of the city's charter provides for the removal by the governor of the president of a borough, upon charges and after a hearing, and, then, for filling any vacancy in the office by the board of aldermen, a fair construction of its scope and purpose, irresistibly, leads the mind to the conclusion that the appointment of the displaced official may not be the subject of consideration by the body, upon which the power is conferred to appoint to the vacant position. Doubtless, he is not disqualified, nor rendered ineligible, for public office by the action of the governor; but the power to remove from the office, as the result of proceedings under the statute, coupled with the power conferred to fill the vacancy caused by the removal, negatives the person's right to be reinstated in the office during the term for which he had been elected. To assert that the power to reinstate existed, because not restricted in words, is to make of the legislative act a vain and foolish thing.

That the People might, thereafter, nominate and re-elect him to a new and complete term of the same office does not affect the conclusion. The implied right to hold office, as an attribute of citizenship, is not negatived by holding that the official removed from office, for maladministration, under authority of a statute, may not be reinstated in his office by an exercise of the power of another department of the municipal government. The rights of citizens are subject to such limitations as the people may see fit to impose in the interests of good government and, therefore, of the public welfare. Such a restriction, as is now under consideration, consequent upon removal from office for official misconduct, is not an unreasonable one and I think it is fairly inferable from the provisions of the statute.

I, therefore, think that Judge HISCOCK is right in the conclusions that he has reached and I will agree with him and vote for the affirmance of the judgment appealed from.

CULLEN, Ch. J. (dissenting). I have no doubt that the statute under which the governor removed the defendant from office is valid and constitutional. By the Greater New York charter (§ 382) it is enacted that the president of a borough may be removed in the same manner as the mayor, as provided in other sections of the act. By section 122 it is provided that the mayor may be removed from his office by the governor in the same manner as sheriffs, and by section 1 of article 10 of the Constitution a sheriff may be removed by the governor, giving to such officer a copy of the charges against him and an opportunity to be heard in his defense. A provision authorizing the removal of the mayor by the governor will be found in the charters of the city of New York ever since the office was made elective, with the exception of a brief period. It is not like the power of removal of the police commissioner, the validity of which was before the court in *People ex rel. Devery* v. *Coler* (173 N. Y. 103). In the statute there under consideration the power conferred upon the governor was absolute and unqualified. The defendant here was subject to removal only upon charges, which necessarily imply misconduct, and after an opportunity of being heard in his defense. Nor can it be well contended that conferring this power upon the governor is a violation of the home rule provision of the Constitution. The sheriff is not only a local officer, but must, by the Constitution, be chosen by the electors. If the Constitution makers did not deem it inconsistent with the spirit of home rule to vest in the governor the power of removing the sheriff, an elective officer, it is difficult to see why the bestowal upon the governor of the same power over an officer who, though local, is not necessarily elective, should be deemed a violation of that spirit. Local officers not specially mentioned in the article of the Constitution referred to, such as county treasurers and superintendents of the poor, have long been subject to removal in the same manner. Such a provision is now found in the Public Officers Law (sec. 23) and the authority of the governor to act under these statutes has never been challenged.

Nor do I deny that the legislature might enact that where an officer had been removed by the governor for official misconduct under these statutes he should not be eligible for reappointment or re-election to fill the vacancy caused by his removal. The legislature may provide qualifications for office when not prescribed by the Constitution, where the qualifications or disqualifications prescribed are not arbitrary. (*People* v. *Platt*, 117 N. Y. 159 ; *People* v. *Purdy*, 154 id. 439 ; *Barker* v. *People*, 3 Cow. 686.)

But the difficulty in this case with the judgment below is that the legislature has enacted no provision of that character, and that judgment cannot be sustained unless this court holds as a matter of law that removal from office disqualifies from re-election or reappointment to the vacancy, although there is no statutory enactment to that effect. I had supposed that the law was too firmly established to the contrary to be open to question. It is true that the judicial decisions to be found on the point are few, but the correctness of a legal principle, like the excellence of the character of an individual, may be as firmly established by its universal acceptance and the failure to question it, as by favorable decisions when the subject is mooted. I think that this is true of the proposition that removal from office does not disqualify. On the 3rd of February, 1769, John Wilkes was expelled from the House of Commons for having published "a scandalous and seditious libel," which undoubtedly was its prerogative. On the 16th of the same month he was re-elected to the Commons without opposition. Thereupon the House of Commons resolved that "John Wilkes having been in this session of Parliament expelled this house, was and is incapable of being elected a member to serve in this Parliament," and his election was declared void. This last action of the House of Commons set the kingdom in a ferment. Though not wanting some defenders, it was the subject of vehement denunciation. Lord Chatham in one of his most famous orations charged that the Commons under the pretense of declaring a law, had made the law and enacted a disqualifica-

tion unknown to the law. The controversy was long continued. A new Parliament having been convoked, Wilkes was elected thereto, and in May, 1782, the House of Commons directed that the resolution that he was disqualified should be expunged from the journals of the house as subversive of the rights of the electors and of the whole people. From that time it has been the accepted law of England that expulsion from the House of Commons does not prevent re-election thereto. (2 May's Constitutional Hist. p. 27.) In 1882 Bradlaugh was expelled from the House of Commons and having been returned by the electors of Northampton, took his seat in the house without question. (Treatise on the Law & Privileges, etc., Parliament, Thos. E. May, 1863, 1864.) The career of John Wilkes is a part of American history, for, profligate though he was, nevertheless he was the steadfast supporter of the rights and liberties of the colonies and courageously resisted the encroachments of the Crown. To that resistance we owe the provision of the Federal Constitution forbidding the issuing of general warrants.

The law of the *Wilkes* case has been universally accepted in this country by statemen, publicists and text-writers, though, as already said, judicial decisions are scanty. Mr. Bancroft, in his History of the United States, says (p. 275, vol. 6): "The disfranchisement of Wilkes had no authority in law." Mr. Cushing in his standard work on Legislative Assemblies, says (p. 182): "Expulsion from a former, or. from the same legislative assembly, cannot be regarded as a personal disqualification, unless specially provided by law." Professor Pomeroy in his Constitutional Law (§ 716) says: "It is true that Senators and Representatives may be expelled by the body to which they belong, but this punishment is plainly inadequate; expulsion removes from the present office, but is no obstacle to a re-election thereto." In 1797 William Blount, a senator from Tennessee, was expelled from the United States Senate for promoting a hostile military expedition against the territories of Spain in the Floridas and Louisiana, in the interest of Great Britain. For that conduct

he was also impeached by the House of Representatives. It was decided by the Senate that Members of Congress of either house were not subject to impeachment. The stress of the argument of the managers of the House in support of impeachment was that expulsion did not prevent his immediate re-election and that impeachment should, therefore, be permitted so that if convicted he would be disqualified from holding office. The assertion that Blount was qualified for re-election was admitted by his counsel and seems to have been assumed as unquestionable.

The Constitution of this state (Art. 6, § 13) prescribes that "Judgment in cases of impeachment shall not extend further than to removal from office, or removal from office and disqualification to hold and enjoy any office of honor, trust or profit under this State," thus recognizing that removal from office itself does not create a disqualification. Upon the conviction of a justice of the Supreme Court on impeachment, when the question of the judgment to be rendered thereon arose, Judge Allen of this court said that if the defendant was simply removed from office he might immediately be re-elected by the people or appointed to fill the vacancy. (Barnard's Impeachment, vol. 3, p. 2195.) We have, however, one judicial decision on the exact point. In *State ex rel. Tyrrell* v. *Common Council* (25 N. J. L. 536) the common council of Jersey City had expelled Tyrrell for bribery and corruption. He was re-elected and the common council then suspended him. Thereupon he sued out a mandamus to compel the common council to recognize him as a member. At the very threshold of the case, presenting the right of the relator to maintain the proceeding, was the question whether he was eligible for re-election, which the defendant challenged. The court held that he was. In answer to the question whether a member of that body who is adjudged to-day to be guilty of gross official misconduct and is therefore expelled as unfit to exercise his office, or even to associate with men of character, can possibly be fit to fill the same office to-morrow, and whether such a man can

be thrust back upon a body of honorable and upright men, as their official compeer and associate, by a misguided constitutency, with the odor of his corruption fresh about him, the court said : "These, however, are questions for the law-making power to consider. It is for the legislature to say how far it is necessary, in particular cases, to limit the power of the members of a common council, or punish particular offenses, and not for the courts." This decision is cited with approval by Judge Dillon in his work on Municipal Corporations (Vol. 1 [4th ed.], § 248).

Nor can any sound reason be given why the result of the removal from office by the governor should, as a matter of law, be any greater than that which flows from expulsion by a legislative body. Whatever may be the view taken in other states, it is settled by a recent decision of this court that the action of the governor in removing a sheriff from office under the constitutional provision that has been cited is not judicial but executive. (*Matter of Guden*, 171 N. Y. 529.) Therefore, if there is any distinction to be drawn from the effect of a removal in judicial proceedings, that distinction is immaterial here.

Against this uniform current of authority we have two recent decisions. The first is *State ex rel. Childs* v. *Durt* (57 Minn. 262). The defendant, a county treasurer, resigned during the pendency of proceedings for removal for misconduct, and thereupon was appointed by the board of county commissioners to fill the vacancy caused by his resignation. The discussion in the opinion is very brief. The court said : "We are of the opinion that he was not eligible for reappointment while under suspension, or during the pendency of the proceedings. The removal proceedings cannot be nullified or reversed in that manner. Such removal proceedings are not merely for the purpose of ousting the person holding the office ; they include a charge that he has forfeited his qualification for the office for the remainder of the term. * * * Whether the voters at the polls could condone the offense by which he forfeited his office it is not necessary here to decide. We are

of the opinion that the county commissioners could not do so."
In *State ex rel. Coleman* v. *Rose* (74 Kan. 262) the doctrine of
the *Dart* case was followed. There the court held that the
removed officer was ineligible even for re-election by the
people. In one respect the decision in the *Rose* case was cer-
tainly logical. If a removed officer is ineligible for appoint-
ment, he is equally ineligible for election. Eligibility is
exclusively an attribute of the person elected or appointed,
and does not at all depend upon the character or position of
those from whom he obtains his title. The election by the
people of an ineligible person to office is invalid. (*People* v.
*Purdy, supra.*) Nor is there any force in the suggestion of
condonation by the people. Condonation, so far as offenses
against the public are concerned, means simply pardon. The
pardoning power is vested exclusively in the governor. While
the ultimate source from which all power is derived is the
people, still the people by their act in adopting a constitution
have limited their own power ; thus, the legislature cannot
delegate to the people the power of making a law. (*Barto*
v. *Himrod*, 8 N. Y. 483.) No more can there be delegated
to the people the power to determine whether a candidate is
eligible or ineligible, nor to pardon his offense if he has com-
mitted one. The arguments of the opinions in these cases,
that to permit the appointment or election of a removed
officer is to reverse or nullify the action of the removing
officer, is not new. The same argument was made by the
apologists for the action of the House of Commons in the
*Wilkes* case. It is answered by the opinion of the Supreme
Court of New Jersey in *State ex rel. Tyrrell* v. *Common
Council* (*supra*). It is not anomalous that the division of the
powers of government may enable one officer to render
nugatory the action of another. The pardoning power
vested in the governor enables him to set at naught the
decisions of courts and juries. The Federal courts of first
instance upheld the constitutionality of the famous sedition
laws. Thomas Jefferson entertained a contrary view, and on
his election as president pardoned all persons who had been

sentenced under that law, avowedly on the ground that the statute was unconstitutional. It is this division of the powers of government that renders the case of a private master or employer a false analogy.

I have said that the doctrine that expulsion from office does not disqualify has been universally accepted, with the exceptions noted. But it is urged that the action of the House of Representatives in the case of B. F. Whittemore, a representative from South Carolina, is to the contrary effect. (1 Hinds' Precedents of the House of Representatives, 487.) That case is misapprehended. The effect of expulsion was not in the case at all, for Whittemore had not been expelled. He had resigned. The ground on which the action of the majority of the House proceeded was that that body could refuse to receive a person guilty of crime, though possessing the constitutional qualifications. This is apparent from the argument of General Logan who moved the resolution. He said (Id. p. 540) : "The Constitution of the United States, which authorizes Congress to prescribe rules and regulations for the government of their members, provides that by a two-thirds vote either House may expel any one of its members without prescribing the offenses for which either House may expel. * * * This being the theory with which I start out, I then assume that where the House of Representatives has power to expel for an offense against its rules or a violation of any law of the land, it has the same power to exclude a person from its body." He distinguished the case then before the House, where a member had been guilty of an actual crime, and that of other persons who after having been censured by the House had resigned and been re-elected. The very distinction made by General Logan shows that it was not the censure of the House nor expulsion from that body that created the disqualification, but the offense of which the member had been guilty, of the sufficiency or insufficiency of which as a ground of exclusion the House was the judge. Surely there is no such right in the courts to review the character of the acts for which this defendant was removed.

This precedent was followed by similar action in the case of Brigham H. Roberts, a representative from Utah, whom the House refused to admit on the ground that he was a polygamist. (Id. p. 527.) There was no question of previous expulsion in that case. The question was the same as in the Whittemore case — the right of the House to exclude for crime or criminal conduct that in its opinion rendered the applicant unfit to be a member of that body. No lawyer can read the clear and forceful minority report of Messrs. Littlefield and De Armond without at least doubting the correctness of this decision. Whether, however, the action of the House was justified or not the cases have no bearing on the proposition that expulsion from office *per se* disqualifies from re-election or reappointment.

The principle underlying the general doctrine is : " Where no limitations are prescribed, however, the right to hold public office under our political system is an implied attribute of citizenship, those and those only who are competent to participate in choosing officers being in general deemed eligible to be chosen." (Mechem on Public Officers, sec. 67.) There are implied exceptions to the rule, but these are only necessary exceptions, such as minority, idiocy and the like. (*Barker* v. *People, supra.*) Even conviction of crime does not disqualify unless the disqualification is prescribed by constitution or statute. In the work of Judge McCrary on Elections (section 354) it is said : " For it is plain that in the absence of such legislation (*i. e.,* forfeiting office on conviction of crime), according to the law, which seems well settled, a convicted felon may, for a time at least, continue to exercise the functions of a public office, unless indeed by imprisonment he be deprived of the power to do so." (See, also, *Commonwealth* v. *Shaver*, 3 Watts & S. 338 ; and *State ex rel. Police Comrs.* v. *Pritchard*, 36 N. J. L. 101.) In *People ex rel. Bush* v. *Thornton* (25 Hun, 456) it was held that neither the bribing of electors nor the offer to bribe them by a person receiving the certificate of election would render him ineligible or disqualify him from holding

office in the absence of a constitutional or statutory provision declaring such disability. Appreciating that such was the law, for the purpose of preventing bribery, section 1 of article 13 of the Constitution (Constitution of 1846, art. 12, § 1) was amended so as to require a public officer in his official oath to swear that he had been guilty of no bribery in obtaining office. I appreciate the force of the arguments against allowing an officer who has been removed from his office to be again elected or appointed thereto. They are cogent, but they should be addressed to the legislature; not to the courts. The same course should be taken as was taken in reference to bribery. There the Constitution was amended. Here the statute should be amended. But for the courts to declare a disqualification not enacted by the legislature or by the Constitution is, to use the language of Lord Chatham, not to declare the law, but to make the law. What led the legislature to omit disqualifying the removed officer we know not. It may be because it did not occur to the lawmakers that where an officer had been removed for misconduct, appointing officers or electors would return him to the office from which he had been removed. If such was the case, then there is simply an omission in the statute which the courts cannot supply. On the other hand, it is possible that the legislature intended to give a removed official an opportunity to review the justice of his removal by seeking for re-election or reappointment to the office. In 1874 the governor of the state removed the district attorney of Kings county. In the general election of that year the incumbent so removed was re-elected to the office by the electors of the county. He was removed during the last year of his term, so the term to which he was elected covered no part of the old term. But under the Constitution a vacancy in that office and the other offices mentioned in article 10 of the Constitution must be held at the next election for a full term. (*Coutant* v. *People*, 11 Wend. 511.) Therefore, had the district attorney been removed in the first or second year of his term and the electors shown the same confidence

in him, he would have held office for part of the very term from which he had been removed. The same condition exists as to judicial officers. When a vacancy occurs in the office of a judge of this court, or of a justice of the Supreme Court, it is to be filled at the next general election happening not less than three months thereafter for a full term. It is conceded that in these cases an officer who has been removed in accordance with the Constitution, unless disqualified from holding office by the sentence of a court of impeachment, would be qualified for re-election for a new term. What then becomes of the theory that removal is from the whole of the official term and, therefore, precludes election to the vacancy? If the people have found no inconsistency between the power of removal of a constitutional officer and his eligibility to fill the vacancy created by his removal, how can a court be justified in declaring that such an inconsistency would be created by legislative enactment of a similar character?

The case before us does seem to display in the appointing officers reckless disregard of the action of the governor, but the evil can easily be corrected by the legislature. If the courts, in the attempt to correct it, decide the proposition that removal from office imports as matter of law a disqualification to fill the vacancy, I fear that the decision may soon return to plague them, and most of all I fear that it will afford a precedent for legislative bodies, the qualifications of whose members are prescribed by the Constitution, to overturn a settled principle of constitutional law.

The order of the Appellate Division should be reversed and the judgment of the Special Term affirmed, with costs in both courts.

HISCOCK, EDWARD T. BARTLETT and GRAY, JJ., read for affirmance, and WERNER, J., concurs; CULLEN, Ch. J., reads dissenting opinion, with whom CHASE, J., concurs; WILLARD BARTLETT, J., not sitting.

Order affirmed.